617 So.2d 1144 (1993)
Deborah R. HARVEY, Appellant,
v.
STATE of Florida, Appellee.
No. 90-945.
District Court of Appeal of Florida, First District.
May 13, 1993.
*1145 Clyde M. Collins, Jr., Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen., and Edward C. Hill, Jr., Asst. Atty. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
Deborah Harvey appeals her conviction of violating section 895.03, Florida Statutes (1987), Florida's Racketeer Influenced and Corrupt Organization (RICO) Act. She raises two primary issues on appeal: (1) the circuit court erred in denying her motions for judgment of acquittal because the state failed to prove the "pattern of racketeering activity" element of the racketeering offense and the intent element of the grand theft predicate incidents; and (2) the not guilty and hung jury verdicts as to the predicate grand theft counts alleged in the information require reversal of the racketeering count. Finding no merit to either point, we affirm.
The state's three-count amended information alleges in the first count that Harvey violated section 895.03(4), Florida Statutes, beginning on March 31, 1989, and continuing through August 9, 1989, by:
being associated, to-wit: the President and one of the Directors, with an enterprise, to-wit: Foundation for Children with Spina Bifida, Inc., a Florida Corporation, associated for the purpose of engaging in, arranging and facilitating various criminal activities, did conduct or participate directly or indirectly in said enterprise through a pattern of racketeering activity, more particularly described as follows:
The subsequent paragraphs of the first count, labeled A through G, generally allege that between March 31, 1989, and August 9, 1989, Harvey associated with the Foundation for the purpose of engaging in certain activities, including obtaining, endeavoring to obtain, or using money obtained from individuals in several Florida counties, including Duval, Lee (Fort Myers), and Collier Counties, with the intent to temporarily or permanently deprive those individuals of the right to the money or the benefit therefrom, or to use the money or property for her own use or the use of persons not entitled thereto. These paragraphs also allege that Harvey, in association with the Foundation, solicited and obtained money from persons in Duval and other counties by making material misrepresentations that 70% of all moneys collected was going directly to supplying children having spina bifida with braces, wheelchairs, diapers, scholarship, or therapy, or going directly to the charitable cause of *1146 helping children with spina bifida; and that Harvey arranged for solicitors to travel to Duval and other counties for the purpose of soliciting funds. The second count alleges that Harvey alone, on or between July 8 and July 10, 1989, "pursuant to one scheme or course of conduct," committed grand theft from "various persons, a better description unknown, contributing money to the Foundation ..." The third count alleges that Harvey, on or between July 27 and July 28, 1989, committed grand theft using similar means.
The state presented testimony and evidence at the jury trial that shows the following. Mark Cava, one of the three former directors of the Foundation, testified that approximately three weeks after he met Harvey she mentioned that she wanted to form the Foundation. She told him that her primary objective in doing so was "[t]o make money." Cava eventually agreed to assist Harvey in acquiring most of the funds to start the Foundation by a credit card scheme using Harvey's old credit card slips.[1] He also assisted in forming the foundation corporation with the aid of an attorney selected by Harvey. Harvey, Cava, and Carol Pounds were named directors. But, other than the initial meeting of the board of directors in the attorney's office at which the bylaws were ratified, Cava never attended any other Foundation meeting, never voted on any Foundation policy or major expenditures, never approved Harvey's salary, and was never provided with an accounting of the Foundation's funds. Cava also testified that he and Harvey made a separate agreement to steal money from the Foundation by "[t]aking money [approximately 10-20%] right off the gross proceeds" of the money collected. He described other ways that he and Harvey "stole" the money collected for the Foundation, including an occasion when they were in Tampa collecting money during which he and Harvey took money from the collection bags and used it to take her children and her mother to Busch Gardens, to pay baby sitters, and to pay for other "pleasurties." He further testified that Harvey was aware of the falsity of the statements made by the Foundation's collectors that 70% of the contributions was going to direct services for the children, and that Harvey's knowledge of the falsity of such statements is shown by the fact that the payroll itself amounted to more than 30% of the gross proceeds.
Carl Traux, who worked for the Foundation between May and August 1989, first as a collector and later as a crew chief of other collectors, testified that money was collected by collectors who received instructions from Harvey at the Foundation's office located at Harvey's residence. They were told where to collect, how to collect, what to wear, and what to say. Harvey instructed Traux to tell the collectors that they were to say that "70 percent [of collections] went for wheelchairs, crutches, diapers, therapy" and "30 percent went to office expenses and so on." At the end of each collection day Traux, pursuant to instructions, would calculate the collections, pay the collectors, hotel and gas expenses out of the collections, and then either send the balance of the money to Sarasota by Greyhound bus or deposit it in a bank when in Naples. He testified that pursuant to this course of conduct, approximately 35 to 40 percent of the money collected went to salaries and expenses before the balance was forwarded to Harvey, and that Harvey was aware of this disposition of the proceeds. Traux described one occasion on which Harvey instructed him to use the collections to obtain a cashier's check for $1,227 in her name. Traux testified that only after he told Harvey that a law enforcement agent had contacted him regarding an investigation of the Foundation did Harvey instruct him that while collecting he was to make sure he said that the 70% figure was "projected." Harvey later told Traux that the "the shit was going to hit the fan" because she was afraid that the IRS was investigating them and that everyone *1147 would have to complete W-2s and W-4s and have to be paid by checks.
Carol Pounds, who worked as the Foundation's secretary and was one of its three directors, testified that the Foundation's records indicate that approximately $191,000 passed through the Foundation's bank account, and that this figure did not include payments to the collectors from portions of the collections not sent to the Foundation. Pounds explained that when she started working for the Foundation she used to conduct day-to-day or week-to-week review of the Foundation's books and bank accounts, but Harvey later terminated that review completely. Pounds did not see any checks or payments made by the Foundation for the purchase of wheelchairs, braces, therapy or diapers for children with spina bifida, as the collectors represented. However, a number of checks were written on the Foundation's account expending Foundation funds without her approval or the approval of the other director (Cava), including three checks totaling $3,000 payable to the Child Development Center of Sarasota, which she was not aware had anything to do with spina bifida. Four checks (ranging from $500 to $1,000) were made payable to the Children's Network Hospital but sent to LePetite Academy, a school that Harvey's children attended, because the school was offering a trip to Disneyland for the family that raised the most money. A check was made payable to a national organization that raises money for spina bifida to purchase an ad in a magazine. The Foundation also paid most of Harvey's rent on her townhouse, but neither Pounds nor Cava approved this expense or any other expense for the Foundation, including Harvey's salary. Pounds testified that use of the word "projection" in the solicitors' representations was discussed only after Traux informed Harvey about the investigation of the Foundation. Also, after law enforcement officers visited the townhouse and Pounds had voluntarily turned over the Foundation's records to the officers, Pounds began to have concerns about the Foundation's operation and began to question whether 70% of the funds were really being used for the children.
Harvey moved for judgment of acquittal on several grounds, including: that the state failed to prove the charged offense of grand theft; that no crime occurred in Duval County where the trial was being held; and that the RICO count must fail because the state failed to prove the predicate theft incidents. The motions were denied and the jury's verdict found Harvey guilty of "racketeering, as charged in the information," and not guilty of count II (grand theft). However, the jury was unable to reach a verdict on the third count charging grand theft. The court adjudicated Harvey guilty of violating the RICO Act (count I) and sentenced her to a term of imprisonment.
On this appeal, Harvey contends that the circuit court erred in denying her motion for judgment of acquittal based on the ground that the state failed to prove the "pattern of racketeering activity" element of the offense, because the evidence only proved sporadic acts of criminal conduct over a short four-month period. A four-month scheme, she argues, does not involve a sufficiently "substantial" period of time to satisfy this element, and there is insufficient evidence to establish a threat of continuing racketeering because the evidence showed that her alleged activities had almost ceased due to curtailed contributions and the Foundation's inability to pay its bills. She also argues that the state failed to prove the intent element of the alleged grand theft predicate incidents.
We find no merit in these arguments. In State v. Lucas, 600 So.2d 1093 (Fla. 1992), the supreme court reaffirmed its earlier holding in Bowden v. State, 402 So.2d 1173 (Fla. 1981), that the "pattern of racketeering activity" element of Florida's RICO Act includes a "continuity" requirement, and the court approved the concepts expressed by the United States Supreme Court in H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), concerning the continuity requirement and the proof necessary to establish it. See also Shimek v. State, 610 So.2d 632 (Fla. 1st DCA 1992). On the record before us, the state's evidence was *1148 sufficient to establish a prima facie case on all elements of the RICO offense, including the "continuity" requirement based on the "open-ended" concept described in H.J. and the grand theft predicate incidents.
Harvey next contends that the not guilty verdict and hung jury regarding the grand theft counts require reversal of the racketeering count because, she argues, the "pattern of racketeering activity" element of the racketeering offense requires, for her to be found guilty of racketeering, that she be convicted of at least two predicate incidents. In support of this contention, Harvey cites several federal cases in which racketeering convictions were reversed because it was impossible to determine which of the several predicates the jury used to support the racketeering conviction.
We find no merit in this contention. The definition of "racketeering activity" in subsection 895.02(1), Florida Statutes (1987), does not require the state to obtain convictions for the alleged predicate incidents. It merely requires proof of "[a]ny crime which is chargeable by indictment or information" under the specific provisions of the Florida Statutes enumerated therein. § 895.02(1)(a), Fla. Stat. (1987). The guilty verdict on the racketeering offense (count I) and the not guilty verdict and hung jury on the grand theft counts alleged in counts II and III are not necessarily inconsistent because the predicate incidents in paragraphs A-G supporting the racketeering count allege a time period for committing grand theft that is different from the time period alleged in the separate grand theft counts in counts II and III. Furthermore, even if the verdicts are inconsistent, this fact alone affords no basis for reversal of the racketeering conviction. See Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); United States v. Powell, 469 U.S. 57, 62, 105 S.Ct. 471, 475, 83 L.Ed.2d 461 (1984). See also Goodwin v. State, 157 Fla. 751, 26 So.2d 898 (Fla. 1946) (adopting Dunn).
Accordingly, Harvey's conviction of racketeering under count I is AFFIRMED.
BARFIELD and MINER, JJ., concur.
NOTES
[1] Cava testified that they "wrote out the credit slips and turned them into [sic] a merchant who had a merchant I.D. number, and he gave us the money for the credit slips." The net effect was that the slips acted like a check and the merchant received ten percent of the face value of the slips as a fee.