819 So.2d 208 (2002)
Kent Tippets BLACK, Appellant,
v.
STATE of Florida, Appellee.
No. 1D99-3682.
District Court of Appeal of Florida, First District.
May 31, 2002.
*210 Michael R. Rollo, Court-Appointed Attorney, Pensacola, for Appellant.
Robert A. Butterworth, Attorney General; James W. Rogers, Senior Assistant Attorney General, and Daniel A. David, Assistant Attorney General, Tallahassee, for Appellee.
BENTON, J.
Kent Tippets Black appeals three felony convictions arising out of security sales he made to Escambia County as a salesperson for First Montauk Securities Corporation (Montauk). He stands convicted of conducting or participating in the affairs of an enterprise through a pattern of racketeering in violation of section 895.03(3), Florida Statutes (1993), of conspiracy to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity in violation of section 895.03(4), Florida Statutes (1993), and of obtaining $50,000 or more by organized fraud in violation of the Florida Communications Fraud Act, section 817.034(4)(a)1., Florida Statutes (1993). As predicate acts comprising a "pattern of racketeering activity," the RICO counts alleged two or more violations of the Florida Securities and Investor Protection Act, section 517.301(1)(a), Florida Statutes (1993). We affirm.

I.
Initially, Mr. Black contends that Florida lacked personal jurisdiction over him and, insofar as the prosecution depended on evidence of out-of-state transactions, subject-matter jurisdiction, as well. With respect to personal jurisdiction, his physical presence at trial defeats his claim. "[D]ue process of law is satisfied when one present in court is convicted of a crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952). See Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886).
With respect to Florida's subject matter jurisdiction over criminal offenses, the Legislature has declared any person amenable to prosecution in Florida and accountable under Florida criminal law where
by his own conduct or that of another for which he is legally accountable ...
(a) The offense is committed wholly or partly within the state; [or]
. . . .
(c) The conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state ...
§ 910.005(1), Fla. Stat. (1993). An offense is committed partly within the state, the statute[1] further declares, "if either the conduct that is an element of the offense or the result that is an element[ ] occurs *211 within the state." § 910.005(2), Fla. Stat. (1993).
"The general rule ... is that jurisdiction is to be determined solely from the face of the information. McLean v. State, 23 Fla. 281, 2 So. 5 (1887); State v. Vazquez, 450 So.2d 203 (Fla.1984); Allen v. State, 463 So.2d 351 (Fla. 1st DCA 1985); Brehm v. State, 427 So.2d 825 (Fla. 3d DCA 1983)." Zanger v. State, 548 So.2d 746, 748 (Fla. 4th DCA 1989). See Fike v. State, 474 So.2d 1192, 1192 (Fla. 1985); State v. Croy, 813 So.2d 993, 996 (Fla. 1st DCA 2002) ("The state charged a felony violation ... thereby conferring jurisdiction on the circuit court.").
The information in the present case alleged that substantive offenses as well as a conspiracy took place partly in Florida. See Keen v. State, 504 So.2d 396, 399 (Fla. 1987) ("[W]hen one of the essential elements of the offense occurs in Florida, Florida courts have the power to try the defendant; whether an essential element of the offense occurred within the state is a factual question to be determined by the jury under appropriate instructions."), overruled on other grounds by Owen v. State, 596 So.2d 985, 990 (Fla.1992); Lane v. State, 388 So.2d 1022, 1026 (Fla.1980); Ross v. State, 664 So.2d 1004, 1009 (Fla. 4th DCA 1995) (holding conspiracy could be prosecuted where agreement was reached in Florida even though overt acts took place elsewhere); Domberg v. State, 518 So.2d 1360, 1361 (Fla. 1st DCA 1988) (holding conspirator whose participation was entirely outside Florida is subject to prosecution for "conspiracy which encompassed repeated acts within the state"); Carone v. State, 361 So.2d 437, 437-38 (Fla. 2d DCA 1978).
The state alleged substantive offenses, moreover, that have elements that were results or effects occurring in Florida. Under section 817.034(4)(a)1., Florida Statutes (1993), any "person who engages in a scheme to defraud and obtains property thereby ... [i]f the amount of property obtained has an aggregate value of $50,000 or more ... is guilty of a felony of the first degree." In charging this crime, the information alleged that Escambia County was the victim of the fraud and therefore by implication that a "result that is an element" (obtaining property from Escambia County) occurred within Florida. See § 910.005(2), Fla. Stat. (1993).
Similarly, in connection with rendering investment advice or with selling securities or offering them for sale, section 517.301(1)(a), Florida Statutes (1993), makes it unlawful, inter alia, to "obtain money ... by means of any untrue statement of a material fact or any [misleading] omission to state a material fact," § 517.301(1)(a)2., Fla. Stat. (1993), or to "engage in any transaction, practice, or course of business which operates ... as a fraud." § 517.301(1)(a)3., Fla. Stat. (1993). At least two violations of section 517.301(1)(a) in which money was obtained from Escambia County were alleged as elements (predicate offenses) of the substantive RICO offense.
The state also alleged and proved "act[s] in furtherance of the [RICO] conspiracy occur[ring] in the state." § 910.005(1)(c), Fla. Stat. (1993). The sales in question were agreed to over the telephone and in facsimile transmissions, and it has been held that "a telephone call constitutes conduct in the jurisdiction in which the call is received." State v. Meyers, 72 Haw. 591, 825 P.2d 1062, 1064-65 (1992). See People v. Baker, 268 Ill. App.3d 16, 205 Ill.Dec. 335, 643 N.E.2d 286, 287 (1994); Sykes v. State, 578 N.W.2d 807, 812 (Minn.Ct.App.1998); State v. Campa, 2002 WL 471174 (Ohio 1st DCA Mar. 29, 2002); Shappley v. State, 520 S.W.2d 766, 768 (Tex.Ct.Crim.App. *212 1974) ("Criminal liability attached when appellant commenced dealing in securities within the state [by telephone from a neighboring state], regardless of where the commercial technicality of `delivery' was effectuated."). The same would logically be true of faxes, and we hold that a conspiracy carried forward by sending faxes into Florida from another jurisdiction is punishable in Florida under Florida law.

II.
The trial court properly denied appellant's motions for judgment of acquittal. The state alleged substantive and conspiracy RICO offenses against Mr. Black based on violations of section 517.301(1)(a), Florida Statutes (1993), which the state alleged under three theories:
1. To directly or indirectly employ a device, scheme, or artifice to defraud, in connection with the offer, sale or purchase of a security, by purchasing all or substantially all of a class or tranche of one or more securities ... from the underwriters of said securities, arranging to sell said securities to, and repurchase said securities from, one or more broker dealers ... at pre-arranged prices determined by the Defendants, and thereafter selling, directly or indirectly, said securities to one or more customers ... at prices that were excessive and not determined by the market....
2. To directly or indirectly engage in a transaction, practice, or course of business which operates or would operate as a fraud or deceit, in connection with the offer, sale or purchase of a security ... by arranging to sell securities to, and repurchase securities from, Escambia County at prices that would guarantee against loss, without issuing a confirmation, memorandum, or other instruction of each brokerage order that truly and accurately reflected the agreement to repurchase said securities, thus enabling the Defendants to shift the risk of loss to Escambia County without incurring any liability for any such loss to themselves or First Montauk....
3. To directly or indirectly obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with the offer, sale or purchase of a security ... by knowingly and falsely representing to Escambia County that said securities were suitable investments in light of Escambia County's investment policies and objectives, or by knowingly and falsely representing to Escambia County that the principal monies invested in said securities were guaranteed against loss by the United States Government, or by knowingly and falsely representing to Escambia County that the prices at which said securities were offered or sold were the market prices, or by failing to disclose the unsuitability of said securities to Escambia County, or by failing to disclose to Escambia County the risk of loss of principal monies invested by Escambia County, or by failing to disclose to Escambia County the actual market prices of said securities....
(These theories correspond to section 517.301(1)(a)1., 3. and 2., respectively.) The state charged Mr. Black and his codefendants under these three theories in the alternative, and adduced evidence at trial that was sufficient proof of chargeable offenses under more than one of the theories.[2]
*213 The state proved the conspiracy that gave rise to the enterprise, that Mr. Black was part of the conspiracy and the enterprise, and that the organized fraud in which the conspirators engaged damaged Escambia County in an amount exceeding $50,000, in violation of section 817.034(4)(a)1., Florida Statutes (1993). The state's evidence was also sufficient to prove that the section 517.301(1)(a) offenses were not isolated, but occurred as part of the ongoing enterprise.

III.
The securities in question here are certain collateralized mortgage obligations (CMOs) derived from home mortgages acquired by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Corporation (Freddie Mac). Although these entities are not governmental agencies and cannot pledge the full faith and credit of the United States, Fannie Mae and Freddie Mac are highly creditworthy. But risks other than their creditworthiness attend ownership of the CMOs they issue. Different CMO tranches or classes have different risk characteristics.
Fannie Mae and Freddie Mac aggregate mortgages into pools, then divide the revenues a pool secures into interest and principal streams that they allocate among different CMO tranches. In this fashion, they create a variety of derivatives, including inverse interest only CMOs and floating inverse interest CMOs (floaters), the types involved in the present case. Holders of inverse interest only CMOs and floaters are entitled to variable revenue streams carved out of interest payments made to retire the underlying mortgages.
Pegged to a short-term interest rate like the London Interbank Offered Rate, inverse interest only CMOs are assigned "notional" principal amounts, but do not entitle their holders to any portion of the principal payments made to retire the underlying mortgages. Floaters do entitle their holders to a portion of the principal payments made to retire the underlying mortgages, but the timing of these payments is contingent on prepayment rates.
Holders of floaters and inverse interest only CMOs are entitled to (ordinarily monthly) payments calculated in accordance with formulas that take into account the (sometimes variable) payments that holders of other CMOs backed by the same pool of mortgages are entitled to. Within stated ranges, as the benchmark short-term interest rate rises, payments to holders of inverse interest only CMOs (and the interest-stream component of payments to holders of floaters) fall and, as the benchmark short-term interest rate falls, the payments to holders of inverse interest only CMOs (and the interest-stream component of payments to holders of floaters) rise. Some floaters and inverse interest only CMOs are highly leveraged, and the value of both floaters and inverse interest only CMOs depends on interest rates over periods as long as thirty years.
Their value also depends on "prepayment rates," the number and timing of mortgagors who discharge obligations secured by the underlying mortgages before the obligations come due. A drop in mortgage interest rates may induce homeowners *214 to refinance by paying off notes secured by mortgages in the pool, years before they are due, in order to obtain new mortgages at lower rates. When a mortgage in the pool is satisfied, the mortgagor's interest payments cease and payments to holders of inverse interest only CMOs (and the interest-stream component of payments to holders of floaters) drop accordingly. Fire, flood and simple relocation can also lead to prepayment of underlying mortgage obligations.

IV.
By placing a "cold call" from Houston, Mr. Black introduced himself to Joseph Flowers, who was Escambia County's comptroller at the time. Mr. Flowers told Mr. Black that Escambia County was interested in safe, secure investments yielding a fair return. He also told Mr. Black that he wanted to make money for the county but did not want to risk losing money. Mr. Flowers had a copy of Escambia County's investment policy sent to Montauk's Houston branch office, which Mr. Black acknowledged receiving.
Each time Mr. Black sold a CMO, Montauk's Houston branch retained all but ten to fifteen percent of the amount by which the sales price exceeded the price at which Montauk had purchased the CMO, and distributed the portion of the markup it retained among Messrs. Hurst, Muller, Lynch and Black. Rules promulgated by the National Association of Securities Dealers limited markups to customers to five percent of the broker's purchase price. But the markups were substantial sums: a single CMO that Montauk sold to Escambia County on December 20, 1993, had been marked up $148,438.
Escambia County's investment policy stated the county's primary investment objectives, as follows:
(A) Safety of principal is the foremost objective of the County. Each investment transaction shall seek to first ensure that capital losses are avoided, whether they be from security defaults or erosion of market value.
(B) The County shall diversify its investments to avoid incurring unreasonable risks regarding specific security types and/or individual financial institutions.
(C) The County's investment portfolio shall remain sufficiently liquid to enable the County to meet all operating requirements which may be reasonably anticipated.
(D) The investment portfolio of the County shall be designed with the objective of regularly exceeding the average return on three-month U.S. Treasury bills, or the average rate on federal funds, whichever is higher.
Initially, Mr. Black sold Escambia County bonds issued by various agencies of the federal government.
Toward the middle of 1993, however, Mr. Black started recommending various CMOs to Mr. Flowers, their volatility, riskiness and illiquidity notwithstanding. At the time, Montauk forbade the Houston branch office to hold CMOs, even overnight, without prior permission from the main office in New Jersey, because CMO prices are so volatile. Only if the Houston office had already arranged the sale of a CMO was it authorized to purchase (or repurchase) the CMO.
In all, Mr. Black sold Escambia County seven different CMOs[3] a total of eleven *215 times. Five of the seven were inverse interest only CMOs and two were floaters. Only one was backed by federally guaranteed mortgages. The amounts payable under at least one of the inverse interest only CMOs moved inversely to, but at four times the rate at which, the London Interbank Offered Rate rose or fell. The jury was free to believe the state's expert who testified that floaters and inverse interest only CMOs "are tremendously risky securities... both in terms of price [volatility] and also in terms of whether or not you would get back your principal in the end."
In "the course of a month or two," he testified, "you could have a substantial decline in the value of these securities, on the order of 50 percent in some cases." They are also illiquid because they "are extremely complex instruments and ... trade basically on a one-of-a-kind basis [albeit] with some analogies to other securities," the same expert testified, without contradiction. Using accepted methodologies, it takes a mathematically adept expert half a day to figure out what one is worth.

V.
The jury was also entitled to believe the experts who testified that Montauk sold CMOs to Escambia County at prices well above market and that the prices Escambia County paid were the product, not of market forces, but of an elaborate conspiracy. There was evidence from which the jury could find that, in their quest for commissions, Mr. Black and his co-defendants manipulated prices and defrauded Escambia County and other customers.
After initially purchasing CMOs from their underwriters or another broker, Montauk sold, bought back after thirty to ninety days, and resold the CMOs among a small group of customers, including National Guardian Life Insurance Company (National Guardian); Our Lady of the Lake Regional Medical Center (Our Lady of the Lake RMC); Gary Towler; Lester Colodny; and the City of Painesville, Ohio (Painesville), or "rolled" them through other securities dealers, including Crestar Mortgage Securities Corporation (Crestar); the Trading Desk of Memphis, Inc. (TDI); Simmons National Bank (Simmons); and Comprehensive Capital Corporation (Comprehensive Capital).

A.
Several experts testified that the prices at which Montauk sold CMOs to Escambia County and its other customers were not market prices. Because Montauk often acquired entire tranches and controlled the market in most of the CMOs at issue, few outside sales are available for comparison.[4] *216 But Montauk did not control the market in Freddie Mac mortgage participation certificates, Series 1492SA, one of the CMOs it sold Escambia County.
Stanford University sold some Freddie Mac mortgage participation certificates, Series 1492SA on November 1, 1993, to Bear, Stearns & Co., after contacting several brokers. Although Stanford's own modeling put the value of the certificates at 40.22, Stanford sold at 24.375 the best price it was quoted.[5] On November 2, 1993, Bear, Stearns & Co. sold the certificates it bought from Stanford to Atlantic Portfolio Analytics and Management (APAM) at 29.5. Using "a fairly thorough and rigorous valuation methodology" involving information from Bloomberg as well as analytical systems internal to APAM, Gerald P. Menozzi had determined that a price of about 30 was commensurate with the risk.
Meanwhile, Montauk repeatedly sold the same security for prices ranging between 55.625 and 56.75. The day after Stanford sold at 24.375, Montauk sold the identical security at 56.59375. An expert testified that no change in the market accounted for the difference in prices. There was apparently no dispute that, while prices for CMOs of the general kinds Montauk was selling were trending down, Montauk's prices rose. The jury heard testimony from Andrew Seth Davidson, a state expert, that Montauk's CMO sales to Escambia County were at prices that exceeded legitimate market prices.

B.
The state put on evidence of price-raising manipulations of two different general types. In the first, the co-defendants bought CMOs, marked them up by as much as five percent, sold them to another broker who sold them to a third broker, who held them for thirty days or so, before selling them back to Montauk at a price Montauk had agreed to before the transaction took place. Generally, this maneuver increased the price Montauk paid (in effect itself) for the security by approximately five percent, and doubled its commissions (the markups) by the time of the next (the first genuine) sale (excluding the sixteenth point that each of the other brokers took for their parts in the scheme.)

1.
Montauk's dealings with guaranteed real estate mortgage investment conduit passthrough certificates of participation in Fannie Mae REMIC Trust 1993-220 provide an example of this type of manipulation. Montauk enlisted two other brokers, Simmons and Crestar, in its scheme to increase commissions and, not incidentally, to manipulate the price of this CMO.
Montauk purchased Fannie Mae REMIC Trust 1993-220 certificates from Bear Stearns & Co. at 9.5. Instead of adding five percent (.475) and earning that markup as a commission by selling directly to Escambia County for 9.975 (9.5 + .475 = 9.975), Montauk sold to Simmons, another broker, for 9.953125. (This included a markup of slightly less than five percent.) Under a prior agreement with Montauk, Simmons resold the CMO to a third broker, *217 Crestar, for resale to Montauk at 10.0. As agreed before any of the transactions occurred, the sales from Montauk to Simmons and from Simmons to Crestar settled the same day, while the sale from Crestar back to Montauk settled some thirty days later.
After repurchasing the Fannie Mae REMIC Trust 1993-220 certificates, Montauk marked them up from 10.0 to 10.5, then sold them to Escambia County. Contending that each transaction must be considered discretely, Montauk maintains it did not violate the federal regulatory prohibition against markups' exceeding five percent. But Escambia County paid more than ten percent more than Montauk paid the first time it purchased the CMO.

2.
At a price of 49.375, Montauk purchased, to give another example of "rolling," the Freddie Mac mortgage participation certificates, Series 1492SA. Instead of adding five percent and earning that markup as a commission by selling directly to Escambia County for 51.84375 (49.375 + 2.46875 = 51.84375), Montauk sold to TDI, another broker, for 52.0 under an agreement that TDI would resell it to a third broker, Crestar, for resale to Montauk at 52.09375. As agreed beforehand, the sales from Montauk to TDI and from TDI to Crestar settled the same day, while the sale from Crestar back to Montauk settled thirty days later.
Not content to earn only one commission with only one such maneuver, Montauk marked up the same CMO from 52.09375 to 54.6875, and again sold it to TDI under an agreement that TDI would resell it to the third broker, Crestar, this time for resale to Montauk at 54.8125. Again as agreed beforehand, the sales from Montauk to TDI and from TDI to Crestar settled the same day, while the sale from Crestar back to Montauk settled thirty-two days later. In short, in order to earn extra commissions, Montauk arbitrarily increased the price at which it eventually (after yet another "rolling" maneuver with the assistance of TDI and Crestar) sold the CMO to Escambia County, at a price approximately 16.77 percent above what Montauk originally paid. Since the market for debt obligations was moving down while all this was taking place, Escambia County overpaid significantly for the CMO because of Montauk's tactics.

3.
Tape recordings of conversations between Mr. McCook of Crestar and Mr. Muller, Mr. Lynch and Mr. Hurst of Montauk were adduced at trial, including the following recording of a January 24, 1994, conversation in which a "rolling" maneuver was agreed upon:
[Mr. Hurst] Hey, do something for me?
[Mr. McCook] Yeah.
[Mr. Hurst] I need to turn some bonds. Turn that recorder on so you can get all of this.
. . . .
... I don't want to write the ticket on the other side until we buy them back next month. Can you do that for me?
[Mr. McCook] Urn, I don't know if I can do that or not. You want me to buy for you from Skip [Livingston of Simmons] and then sell them back to you next month, but not write the sell ticket back to you until they are due next month?
[Mr. Hurst] Yeah, or close to it, you know.
. . . .
[Mr. Hurst] There's 14[8]3 SA. I've got Mule Train and Tool Shed [Mr. Lynch and Mr. Muller] in here.
. . . .

*218 [Mr. McCook] The longest I could think that I could do it, would probably be a few days. I just don't think they would let me buy them, you know, not having them done on the other side. Does that help any?
[Mr. Hurst] It could. If you could just, like on the 4th or something like that.
[Mr. McCook] I don't know if I can go that far or not. I mean, I canI probably would have to do it this week.
[Mr. Hurst] You would?
. . . .
[Mr. Hurst] Well, I would like to have until the 4th. That's what I would like to have.
[Mr. McCook] Do the buy-back on the 4th? All right.
In another conversation later on January 24, 1994, Mr. Hurst and Mr. McCook continued:
[Mr. McCook] What is the dollar price on that?
[Mr. Hurst] 35 and 5 [thirty-seconds] I think.
[Mr. McCook] Well, let me go ahead and nail this down.
. . . .
[Mr. Hurst] 35 and 4 to [Mr. Livingston].
[Mr. McCook] 35 and 4? All right. And I'll pay him 35 and 5, and then you'll buy them back from me.
[Mr. Hurst] 35 and 6 .... or 7, that's what I meant to say.
[Mr. McCook] I knew it was.
[Mr. Hurst] Is that all right?
[Mr. McCook] Yeah, that's good for me.
Mr. McCook testified that, on the strength of these conversations, he bought Freddie Mac mortgage participation certificates, Series 1483SA, (on behalf of Crestar) from Simmons, which he eventually sold back (on behalf of Crestar) to Montauk at the prearranged price of "35 and 7 [thirtyseconds]."
The record contains transaction documents reflecting that these sales took place at the prices prearranged by Messrs. McCook, Hurst, Lynch, and Muller: Montauk sold Freddie Mac mortgage participation certificates, Series 1483SA, to Simmons at 35.125 (35 and 4) with a settlement date of January 26, 1994; Simmons sold the same securities to Crestar at 35.15625 (35 and 5) with a settlement date of February 14, 1994; and Crestar sold them back to Montauk at 35.2188 (rounded slightly from 35 and 7 or 35.21875), also with a settlement date of February 14, 1994.

C.
The other type of price-raising manipulation in which Montauk engaged is a species of churning, or trading in disregard of its customers' interests, in order to "earn" commissions. See Newsom v. Dean Witter Reynolds, Inc., 558 So.2d 1076, 1077 n. 1 (Fla. 1st DCA 1990) ("`Churning' has been described as `a particularly vicious and fraudulent course of conduct,' In re Behel, Johnson & Company, 26 S.E.C. 163, 1947 WL 24844 (1947), `deserving of the severest condemnation. Its very nature brands it as one of the most injurious types of fraud possible. Its perpetrators prey on unwary and inexperienced investors,' Lorenz v. Watson, 258 F.Supp. 724 (E.D.Penn. 1966)."). There was evidence that Mr. Black and his co-defendants moved the same CMOs back and forth among a small group of investors just to generate commissions.
As an institutional investor, Escambia County may well deserve less legal protection from churning in its own account than an "unwary and inexperienced" individual *219 investor, as Mr. Black has argued. But, quite apart from the transactions in its own accountEscambia County repurchased one CMO only eight days after selling itthe evidence showed that Escambia County ended up paying higher prices because of churning in other accounts, including those in which Montauk effectively controlled what its customers bought.[6]
Montauk sold and repurchased certain Freddie Mac mortgage participation certificates, Series 1492SA, approximately twelve times in little over a year. Montauk sold and repurchased other Freddie Mac mortgage participation certificates, Series 1483SA, some nine times over the course of about a year. The fact that Montauk bought these highly volatile securities back (only to resell them the same day) at prices forecast or promised a matter of months beforehand is strong evidence that the prices were not market prices. Our review of the record reveals no transactions where Montauk bought a CMO at one price and then sold at a lower price.
This upward trend despite the falling market was the result of Montauk's price manipulation, which was part and parcel of its scheme to generate commissions by selling and reselling the same securities among a small group of its customers. Even in the rare instances in which Montauk repurchased a CMO for slightly less than it had sold it, Montauk made money so long as the next sale was at a price higher than what it had paid for the CMO.[7]

1.
Montauk purchased the entire tranche of Fannie Mae REMIC Trust 1993-183 certificates from Bear, Stearns & Co. at 90.25, then sold the entire tranche to Comprehensive Capital at 95.75, for resale to Painesville, who, less than a month later, sold it back to Comprehensive Capital. Montauk then bought it back from Comprehensive Capital at 96.1875, and resold the entire tranche to Escambia County at 99. The sales to Comprehensive Capital and Painesville settled March 30, 1994; and both the purchases from Painesville and Comprehensive Capital and the sale to Escambia County settled on April 29, 1994. Comprehensive Capital and Painesville paid the additional commissions occasioned by the sales to and from Comprehensive Capital and Painesville. But the eventual price to Escambia County was excessive, even if the five percent markup cap was not exceeded on any single transaction, and the price Escambia County paid was not determined by the market.

*220 2.
Montauk also purchased the entire tranche of Fannie Mae REMIC Trust 240SC from Bear, Stearns & Co. at 17.34375, then sold the entire tranche to Comprehensive Capital at 18.5645, for resale to Painesville, who, less than a month later, sold it back to Comprehensive Capital. Montauk then bought it back from Comprehensive Capital at 18.4375, and resold the entire tranche to Escambia County at 19. The sales to Comprehensive Capital and Painesville settled January 28, 1994; and both the purchases from Painesville and Comprehensive Capital and the sale to Escambia County settled on March 30, 1994. Again, although other customers paid the additional commissions, the price to Escambia County was excessive and not determined by the market.
The jury heard evidence that the prices in the transactions among Montauk, Comprehensive Capital, and Painesville were all arranged beforehand. The recurring pattern of buying and selling securities at preset prices with markups that hewed more or less closely to the five percent allowed for legitimate markups is inconsistent with the hypothesis that the defendants believed they were selling the CMOs at legitimate market prices.

VI.
By suggesting that Escambia County purchase the CMOs Montauk sold it, Mr. Black, who had been given a copy of Escambia County's investment policy, misrepresented their suitability or their character, or both, or so the jury could have concluded, beyond a reasonable doubt, from the evidence before it. He failed to discuss the unsuitability of the investments with Mr. Flowers or otherwise to alert him to their incompatibility with the investment policy he had been furnished.[8]
Mr. Black made material omissions, the state experts testified, by not fully advising Mr. Flowers of the characteristics and risks of the CMOs Montauk sold to Escambia County. Certain Bloomberg horizon analyses that Mr. Black furnished Mr. Flowers by fax (usually, if not always, after Mr. Flowers had agreed to buy the CMO) failed to supply these omissions. They bespeak, moreover, another type of deceit.
The horizon analyses provided by Mr. Black reflect an assumption that Montauk would repurchase the CMOs at a certain price (or in some cases at one of two possible prices) on a specific date. Mr. Flowers testified that, when Mr. Black offered the CMOs to Escambia County, he promised that Montauk would buy the CMO back thirty, sixty, or ninety days later. (Unlike some of Montauk's other customers, Mr. Flowers testified that the buy-back prices were not "guaranteed.") Even though Mr. Black did not write tickets or otherwise bind Montauk legally to these repurchases, the Bloomberg horizon analyses he gave Escambia County valued the CMOs as if they were certain to be liquidated at specified prices at the end of thirty, sixty or ninety days.
*221 According to expert testimony the state adduced, these horizon analyses misstated the values of the CMOs, because Montauk had no legal duty to buy them back. Their faulty assumptions led to overstated prices based on understated risks that indicated deceptively high rates of return. The Bloomberg horizon analyses did not address the risks of holding the securities beyond preset sale dates, or of having to sell at market prices.
Mr. Black knew that he could not, as a practical matter, assure Mr. Flowers that Montauk would repurchase a CMO at a specific time and for a specific price unless another Montauk customer could be counted on to buy at that time for that (or usually at some higher) price. (Montauk prohibited the Houston branch office from holding CMOs even overnight without prior permission, permission that was not granted.)
The interlocking web of transactions the prosecution painstakingly proved is substantial evidence that Mr. Black was involved in a conspiracy and engaged in a racketeering enterprise with his co-defendants. This is a case where "the evidence used to establish the pattern of racketeering element ... [is also] used to establish the enterprise element." Gross v. State, 765 So.2d 39, 45 (Fla.2000). The state put on evidence of "a continuity of criminal activity as well as a similarity and interrelatedness between these activities," and proved "more than accidental or unrelated instances of proscribed behavior." Bowden v. State, 402 So.2d 1173, 1174 (Fla. 1981).
Tape recorded conversations like the one set out above gave the jury adequate evidence on which to conclude that Mr. Black and his co-defendants were engaged in an enterprise (and furthering a conspiracy) to defraud their customers by selling several CMOs at excessive prices not determined by the market, without disclosing that they were doing so. The frequency, number and interdependence of the transactions gave the jury good reason to believe a conspiracy had given rise to a coordinated, criminal enterprise.
Whenever one of the defendants repurchased a CMO for Montauk, he necessarily knew another customer would purchase it as of the same settlement date. Because these CMOs passed among customers with whom each of the defendants dealt, the jury naturally inferred that the defendants were working together. Each necessarily knew when a co-defendant had arranged to sell a CMO he repurchased or to repurchase a CMO he sold. Mr. Black's assurances to Mr. Flowers were evidence of his participation with the co-defendants in an enterprise and conspiracy to trade in CMOs at prices set sometimes months in advance, prices which the evidence showed were excessive and not determined by the market. See McGough v. State, 302 So.2d 751, 755 (Fla.1974) (holding circumstantial evidence of intent inconsistent with the defense's theory of innocence sufficient); Bartlett v. State, 765 So.2d 799, 799-800 (Fla. 1st DCA 2000).
Mr. Mucci of National Guardian testified that he told Mr. Lynch that National Guardian would no longer be adding to the CMO portfolio it had acquired from Montauk, and would probably be reducing it. According to Mr. Mucci, after he told Mr. Lynch that National Guardian would no longer deal with Montauk, Mr. Lynch responded that
you will be taking a lot of losses if you sell those securities, and I said I know. And he said well, you know you don't have to do that....
The fact that Montauk was selling the CMOs at prices above market furthered the plan, and not only because the elevated prices reflected the "extra" commissions. Until the scheme unraveled, none of the customers would have sold (at a lower *222 price) elsewhere, rendering unavailable a CMO Montauk had committed to deliver to another customer.

VII.
At first, Montauk repurchased CMOs it sold Escambia County at the prices set out in the horizon analyses. But, in the spring of 1994, Montauk refused to repurchase the CMOs at those prices. Escambia County was left holding the entire tranches of four CMOs, Fannie Mae REMIC trust certificates, Series 1993-220 SB, part of which Escambia County purchased on March 30, 1993, at 11.25, for $1,125,000.00, and the remainder of which it purchased on April 29, 1993, also at 11.25, for $1,059,018.75; Fannie Mae REMIC trust certificates, Series 1993-240SC, which Escambia County purchased on March 30, 1994, at 19, for $1,001,300.00; Fannie Mae REMIC trust certificates, Series 1993-183SC, which Escambia County purchased on April 29, 1994, at 99, for $865,203.70; and Freddie Mac mortgage participation certificates, Series 1580SC, which Escambia County purchased on February 28, 1993, at 99.25, for $3,157,591.99. In all, Escambia County paid $7,208,114.44 for these securities.
Escambia County was unable to sell them to other brokers for anything like what it had paid. In September of 1994, other brokers put their aggregate value at $3,366,245.43. Roger Cobb, a vice-president of First Union Capital Markets, reviewed Escambia County's portfolio and prepared a report dated March 31, 1995, in which he opined that, as of March of 1995, the aggregate value of the CMOs was $2,374,094.72. Needing cash, Escambia County eventually sold the CMOs in June of 1995, after the market had risen, and received $4,177,730.86 for all four tranches. Escambia County's loss of $3,030,383.58 was mitigated by monthly payments aggregating $1,255,932.00 the County received because it held the CMOs.

VIII.
The trial court had jurisdiction of the person of the appellant and of the crimes of which he has been convicted. It did not err in denying his motion for judgment of acquittal as to the section 895.03(3) and (4) counts, because the state put on adequate evidence of his participation both in a conspiracy and in "a continuity of criminal activity so as to meet the definition of `pattern of racketeering activity' under the Florida RICO Act." State v. Lucas, 600 So.2d 1093, 1096 (Fla.1992). The evidence that Escambia County was defrauded in an amount exceeding $50,000, in violation of section 817.034(4)(a)1, was also sufficient.
Affirmed.
DAVIS and BROWNING, JJ., concur.
NOTES
[1] These statutory provisions do not exceed "Florida's sovereign authority [which] includes the ability to exercise criminal jurisdiction over acts committed outside the territorial limits of the State under the effects doctrine." State v. Stepansky, 761 So.2d 1027, 1035 (Fla.2000) (construing § 910.006(3)(d), Fla. Stat. (1995)). The Stepansky court quoted Justice Holmes's formulation of the "effects doctrine" in Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911) ("Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power."), but did not suggest that the common law effects doctrine conflicted with Florida's comprehensive, superseding statutes on state criminal jurisdiction. Stepansky, 761 So.2d at 1035.
[2] "The definition of `racketeering activity' in subsection 895.02(1), Florida Statutes (1987), does not require the state to obtain convictions for the alleged predicate incidents. It merely requires proof of `[a]ny crime which is chargeable by indictment or information' under the specific provisions of the Florida Statutes enumerated therein. § 895.02(1)(a), Fla. Stat. (1987)." Harvey v. State, 617 So.2d 1144, 1148 (Fla. 1st DCA 1993).
[3] In addition to the four CMOs Escambia County eventually sold through other brokers, the state charged Mr. Black and the other defendants with violating the law in transactions with Escambia County involving Freddie Mac mortgage participation certificates, Series 1492SA; Freddie Mac mortgage participation certificates, Series 1483SA; and Freddie Mac mortgage participation certificates, Series 21SA.
[4] Roger Cox, an investment advisor, testified that, in 1993 and 1994, the market prices of inverse interest only securities were falling, but noted that Montauk's prices for inverse interest only CMOs were rising in the same period, so that Montauk's prices were completely at odds with the general market trend.

Mr. Davidson, who testified that the trades between Escambia County and Montauk occurred at prices above market, explained his opinion:
I believe that any intent to misrepresent that I described is not related solely to what the price o[f] a bond was on a particular date but related to the whole pattern of trading activities that occurred and not related to a single trade on a single date but related to the fact that the securities were purchased at one price and sold to another party ... for an increase in price, that securities were bought and sold at prices prespecified on analysis that may or may not have set market prices subject to market conditions. And then that on top of all of that, those prices of those transactions from those suspicious activities bore no relationship to what was going on in the market for similar securities. And that combination of facts together leaves no doubt it was in fact a deliberate attempt.
[5] The transaction settled on November 8, 1993. Price is stated as a percentage of a CMO's face amount. Twenty-four and twelve thirty-seconds (also written as 24-12 and spoken as "24 and 12") means 24.375 percent of the notional principal stated on the face of a certificate.
[6] An account representative from Comprehensive Capital, Kenneth Schulte, testified that he and Mr. Muller set up a "program" under which Mr. Schulte obtained authority to manage CMO portfolios for Painesville and Mr. Colodny. Mr. Schulte then relied heavily (if not entirely) on Mr. Muller's advice in a series of transactions in these accounts in which CMOs were held from approximately thirty to approximately ninety days, before being resold. Montauk also engaged in several CMO transactions with Gary Towler, a brother-in-law of a Montauk salesperson.

Howard Harville, chief financial officer of Our Lady of the Lake RMC, testified that, having purchased several CMOs from Montauk's Mr. Hurst and then being advised that selling them would entail substantial losses, the hospital instructed Mr. Hurst "to get [the hospital] out of those investments over whatever period of time was reasonable to do that." Mr. Hurst and Montauk had full discretion in managing the hospital's CMOs pending their liquidation In a series of transactions after he was given this authority, Mr. Hurst exchanged the CMOs the hospital originally held for other CMOs.
[7] A customer who received (an) interest payment(s) while holding a CMO could come out ahead even if it sold the CMO back at or below the price it had paid for it.
[8] According to the state's experts, the floaters and inverse interest only CMOs were not suitable because Escambia County's principal investment was not safe, because the CMOs' complexity meant they were not very liquid, because they were "tremendously" risky, and because of their high price volatility. The jury could find that Mr. Black violated section 517.301(1)(a) by failing to disclose that the CMOs did not comport with Escambia County's investment policy, even though he was dealing with an institution. Mr. Black testified that Mr. Flowers had not researched any of the CMOs in question, as far as he was aware, and knew Mr. Flowers wanted to abide by the county's written investment policy.